UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MURRAY PAVING & RECLAMATION, INC.,

Plaintiff, v.

INGERSOLL-RAND EQUIPMENT & SERVICES
COMPANY and INGERSOLL-RAND COMPANY,

Defendants.

CIVIL ACTION No. 04-10328 GAO

## AFFIDAVIT OF ARNOLD G. JOHNSON, JR.
## IN OPPOSITION TO
## INGERSOLL-RAND COMPANY'S MOTION FOR SUMMARY JUDGMENT

I, Arnold G. Johnson, Jr., being duly sworn, on oath depose and say that:

1.     I am President of Murray Paving & Reclamation, Inc. (Murray Paving) and have actual knowledge of the matters set forth herein;

2.     I have worked in the paving industry in Massachusetts during my entire adult life. I started work for E.C.Murray Construction Co., Inc. (EC Murray) a Massachusetts corporation started by my grandfather, Edward C. Murray, in the 1920s. I continued working for EC Murray, which was later owned, in part, by my father, Arnold G. Johnson, Sr., until 1993, when my brother, Stephen E. Johnson, and I formed Murray Paving. All of my experience, whether working for EC Murray or Murray Paving, has been on the field, or production side of the business. My father, previously, and my brother, since we have operated Murray Paving, worked on the sales and administrative side of the business. I am intimately familiar with the various machines customarily used and employed in the paving business; I have purchased, sold,

operated, helped repair and otherwise dealt with the various machines owned and used, first by EC Murray, and later by Murray Paving, throughout my employment by EC Murray and Murray Paving. Prior to the purchase of the Blaw-Knox paver that is the subject of this litigation, neither EC Murray nor Murray Paving, nor I, personally, had ever owned a Blaw-Knox paver, but I have had "hands-on" experience with pavers manufactured by other companies, particularly Barber Greene, and I have knowledge of the operation of pavers in general, and learned of the operation of the Blaw-Knox paver, while it was owned by Murray Paving. Prior to buying the Blaw-Knox paver that is the subject of this litigation, Murray Paving had owned, from time to time, at least five pavers, generally manufactured by Barber Greene. Prior to buying the Blaw-Knox paver, I had, on behalf of Murray Paving, been involved in the purchase of many items of construction equipment from the Southborough, Massachusetts sales and service operation known as Ingersoll-Rand Equipment & Services Company (IRESCO), a business that I had understood was an independent business owned by Ingersoll-Rand Company. I was familiar with the sales and service personnel who worked at the Southborough facility, and had dealt with them with reference to the purchase of new and used equipment, as well as with reference to the purchase of replacement and service parts, for use by the full-time mechanics employed first by EC Murray, and later by Murray Paving, for the maintainance of EC Murray's and Murray Paving's equipment, as well as with reference to service and repair of EC Murray's and Murray Paving's equipment, by IRESCO personnel at IRESCO's facility.

3.     Following the completion of the 2002 paving season, my brother Stephen and I determined that it would be appropriate to purchase a new paver for the following season, at which time we would use the new paver as the basic paving equipment, and would "retire" to a "back-up" role the Barber-Greene paver then owned by Murray Paving, that was approximately

nine years old, had been used for many years, and had thousands hours of use. Although the Barber Greene paver was aging, it was still reliable, but our business was such that we needed a new and dependable paver for the bulk of our work, and accordingly,we decided to purchase a new paver.

4.    I visited the IRESCO facility, spoke with IRESCO personnel, particularly a salesperson named Andy Andre, who was known to me and with whom I had previously done business, and examined the various brochures other sales materials describing Blaw-Knox pavers. Andy Andre was familiar with the business and operation of Murray Paving, knew our equipment needs in general, from prior dealings with me and with Murray Paving, and assisted me in my investigation of the qualities and performance of Blaw-Knox pavers. In due course, I determined that a particular paver would satisfy the needs of Murray Paving, and thereafter following negotiation with Andy Andre, I entered into the purchase contract with IRESCO, committed Murray Paving to the purchase of the paver, the delivery of the "trade-in" equipment, and the payment of the purchase price.

5.    The paver was delivered to Murray Paving on or about May 7, 2003, and after Murray Paving personnel were trained in the operation of the paver, it was included in our equipment fleet, and thereafter used in the usual course of business.

6.    Within days or weeks of Murray Paving's first use of the paver, we experienced problems with the paver that were inconsistent with any "break-in" problems or "bugs" that might otherwise be anticipated or associated with a newly manufactured machine, or that would cease following initial use and the performance of minor adjustments. In particular, some of the problems were as follows: a blow-out of a hydraulic line, electrical short circuits, screed not lifting, under-carriage parts falling off, improperly sized bolts breaking, the front hopper doors

would not lift to empty them selves, even after IRESCO increased hydraulic pressures beyond

factory recommended levels. These problems were brought to the attention of IRESCO

personnel, including Andy Andre and service personnel, and all of the parties cooperated in

working out the various problems, and taking whatever steps were necessary to restore the paver

to full use. Within 40-50 hours of use, however, it was necessary to return the paver to IRESCO's

service facility, for extensive repairs. During the remainder of the summer of 2003, the paver was

returned to IRESCO on several occasions for repairs, which took days and even weeks, rather

than hours, to accomplish. Murray Paving generally uses a paver during the paving season, which,

in this area, extends from April to November, from a minimum of 30 to a maximum of 50+ hours

a week, meaning that Murray Paving had less than one full week's use of the paver before the

initial breakdown, and thereafter, for the most part, was unable to use the paver regularly, with the

lack of use, on at least one occasion, extending to several weeks, while IRESCO obtained the

appropriate repair and replacement parts needed to correct the problems then experienced with the

paver.

    7.    Some of the problems,. all of which were brought to the attention of IRESCO

personnel, included pieces or parts of the paver actually falling off or breaking off the paver for

reasons unknown, but never due to mis-use of the paver. See copies of repair documents attached

to Affidavit of Peter F. Davis, marked "IRCO CONFIDENTIAL 003,0016,0019,0020 and 0036-

103".

    8.    The "down time" of the paver, during which it could not be used by Murray

Paving, either as a primary paver, or even as a back-up paver, but was involved in repairs by

IRESCO personnel, was such that in the 2003 paving season, the paver was available for use for

less than 20% of the hours during which Murray Paving had need for its use, and Murray Paving

4

was forced to rely on the old, presumably less reliable Barber Greene paver. In actuality, the old paver performed without undue difficulty, while the new paver, that Murray Paving had purchased for a total cost (including the value of the equipment used for the trade-in) of approximately $250,000.00, had little use, due either to its unavailability or to its unreliability.

9.    When in use, a paver is operated by one skilled employee, but utilizes a paving crew of 5-6 men, and is used to install bituminous concrete "mix" which is delivered to the job site in truck-load quantities, whether by trucks owned or hired by Murray Paving, and which are lined up to insure a continuous operation, and the installation of the mix while hot. (Mix is purchased at the sales plant, and is loaded onto the trucks at between 325 and 390 degrees. Good practice requires the mix to be installed without undue cooling, to insure proper bonding, and compaction.)

10.    Most of the break-downs of the paver in question, and the problems experienced with the paver, occurred unexpectedly, and generally resulted in Murray Paving personnel, as well as company owned or hired trucks of mix, standing around while repairs, if possible, were accomplished, or, if that was unsuccessful, until the "back-up" Barber Greene paver was brought to the job site, all to the great expense of Murray Paving, and causing Murray Paving to be delayed in the prosecution of its work. In some instances, on-the-job repairs, or the substitution of the Barber Greene paver, were not possible, and Murray Paving experienced a total loss of production, and loss of mix that could not be used, due to such break-downs of the paver.

11.    The difficulties and expense that Murray Paving was experiencing were brought to the attention of IRESCO personnel in general, and to Andy Andre, in particular.

12.    At some point, during the summer of 2003, IRESCO personnel ( I believe it was an individual known to me as Bill Cove) suggested that IRESCO or Ingersoll-Rand would

make a new paver for Murray Paving and would take back the one which was experiencing problems. Contrary to the statement contained in the affidavit of Andrew Andre, filed in this matter, which I have reviewed, there was never any offer to fly me to Tennessee to oversee the production of a new paver, nor was the offer made in such a way that I could have, or should have, known that it was in fact a legitimate and serious offer to try to deal with or solve Murray Paving's problems. Neither IRESCO nor Ingersoll-Rand made any written offer to replace the paver, and I did not give the suggestion any serious consideration. Due to the problems that Murray Paving was experiencing, and due to the importance and necessity of having a reliable paver for use, I would have jumped at the opportunity to have the paver replaced, but I never received any credible offer, or any solid offer from anyone who I could understand was authorized to act on behalf of either IRESCO or Ingersoll-Rand. I specifically DENY any conversation or communication described as set forth in IRCO CONFIDENTIAL 0036 and 0037.

13.    While these problems continued, I instructed counsel for Murray Paving to correspond with Ingersoll-Rand, in an attempt to have someone step up and deal with the problems once and for all. See copies of correspondence attached hereto, marked "IRCO CONFIDENTIAL 0022-0034". At no time, while the correspondence was being exchanged by and between counsel for Murray Paving and Ingersoll-Rand, did anyone on behalf of Ingersoll-Rand formally extend the offer to exchange the paver, or make any offer, other than to promise to continue to repair the paver, in accordance with the warranty. Since many of the "repairs" to the paver were little more than cosmetic or were to replace broken parts of the paver, while not dealing with the cause of the broken parts or the cause of the various break-downs, such a promise was useless, and did not address the actual problems with the paver or the cause of the problems.

14.    At some point, while Murray Paving was experiencing problems with the paver, I

was informed by either a maintainance supervisor known to me as Stanley, or by Bill Cove,

employees of IRESCO, that the paver had been manufactured at an Ingersoll-Rand location where

labor problems had been experienced, and that the paver in question had been one of the last

pieces of equipment manufactured at that location prior to the change over at that location from an

union location to a non-union location, that other machines made at the same time were

experiencing problems similar to ours, and that there was good reason to suspect that there had

possibly been sabotage in the manufacture of the paver, which could possible explain some of the

problems with the paver.

     15.     In spite of the many times the paver was returned to IRESCO for repairs, the paver

was never completely and satisfactorily repaired, and the causes of the breakdowns were never

identified to such an extent that there could be any confidence that the problems and breakdowns

had been dealt with succesfully.  The various breakdowns suffered by the paver were

accompanied on most occasions by "symptoms" of similar problems, and the attempted repairs by

IRESCO merely dealt with the outward and obvious problems, that is, the "symptoms",  but never

took care of whatever underlying defects the paver had that caused the recurring problems. In

addition, some of the breakdowns were for new problems that had not previously been

experienced.

     16.     As a result,  I became increasingly wary of using the paver because of the

continual breakdowns, especially if Murray Paving was busy, and had deadlines to meet, which

precluded taking the chance of a breakdown.  I told employees of IRESCO, including Andy

Andre, of my lack of confidence in the paver, and my concern that they were unable to remedy

the problems and breakdowns completely. The response of  IRESCO was that they were doing

the best they could to take care of the paver, once and for all, but that they, too, could not discover

and remedy whatever underlying and hidden defects there were in the paver that led to the problems.

17.    When I was unable to obtain a satisfactory resolution of the problems, notwithstanding the various correspondence exchanged by my attorney and an attorney for Ingersoll-Rand, I determined that Murray Paving could not afford to keep a $250,000.00 piece of equipment that was not reliable, and that was more of a liability than an asset. I determined that the best action for Murray Paving was to try to cut its losses, and thereupon, I attempted to sell the paver and recoup as much of Murray Paving's investment as possible. Although the paver had only 250 +/- hours of use, and was therefore practically brand new, the best offer I could get for the paver was $200,000.00, and thereupon Murray Paving sold the paver, AS IS, to Aikler Asphalt Paving Co., Inc.(Aikler). The sale included an assignment of the Ingersoll-Rand extended warranty, but the sale price was at least $35,00.00 to $40,000.00 less than a paver of similar age, and having similar use would reasonably be sold, according to my experience and judgment, based on my years of purchasing similar equipment. Keeping in mind that a new Blaw-Knox paver, similar to the one Murray Paving had purchased from IRESCO, would cost about $280,000.00, at the time I sold our paver to Aikler, in my opinion, and based on my experience, a similar used paver, less than one year old, and having as little as 250 hours of use, should have been readily and easily sold for approximately $240,000.00.

Signed under the pains and penalties of perjury, this ˪ 3ʳᵈ ˊ day of December, 2004.


_____
Arnold G. Johnson, Jr.

8

<u>Certificate of Service</u>

I certify that on December 2 , 2004, I served a copy of the within document on defendants by mailing same to their Counsel of Record, Carter D. Morse, Jr., Esquire, Foley Hoag LLP, 155 Seaport Boulevard, Boston, Mass. 02110.

_____
Peter F. Davis

## PETER F. DAVIS
ATTORNEY AND COUNSELLOR-AT-LAW
50 CONGRESS STREET, SUITE 630
BOSTON, MASSACHUSETTS 02109

TELEPHONE: (617) 227-1344
FACSIMILE: (617) 227-3674
FACSIMILE: (617) 723-2844
EMAIL: PFD@DAVISESQ.NET

June 25, 2003

Mr. Peter Schlesinger, President
Blaw-Knox Division of
Ingersoll-Rand Co.
312 Ingersoll Drive
Shippensburg, PA 17257

And

Mr. Herbert L. Henkel, President
Ingersoll-Rand Company
200 Chestnut Ridge Road
Woodcliff, NJ 07675

Re:     Murray Paving & Reclamation, Inc.
        Sales Order No. 641-21990

Gentlemen:

Please be advised that I represent Murray Paving & Reclamation, Inc. ("Murray"), to whom your organization sold a new Blaw-Knox 2003 Model PF-4410 Paver ("the Paver"), as set forth in the above referenced order.

As you have been made aware by Arnold G. Johnson, Jr., President of Murray, the Paver has not operated properly since it was delivered to Murray, and problems with the Paver started on the very first day Murray attempted to use it, and have continued from that date to the present. Despite repairs and modifications made to the Paver by your organization, the Paver continues to fail to operate properly, and cannot be depended upon to perform the tasks for which it was manufactured and sold.

To date, Murray has been deprived of the use of the Paver due to breakdowns and other failures of the Paver, and has suffered many thousands dollars of losses directly attributable to the failure of the Paver to operate properly.

In sum, the Paver has utterly failed to provide the service that a purchaser of new equipment has a right to expect, and in addition, has caused tremendous dollar losses to Murray. Again, you and your organization have, on essentially a daily basis, been made

IRCO CONFIDENTIAL 0022

aware of the problems suffered by Murray in connection with the Paver, and Murray's total dissatisfaction with the Paver.

### ALL OF THE FOREGOING CONSTITUTES A BREACH OF THE CONTRACT BETWEEN MURRAY AND YOU.

Accordingly, you are hereby notified that Murray elects to RESCIND AND TERMINATE the above referenced sales order and contract.

On behalf of Murray, DEMAND is hereby made that you FORTHWITH take such steps as are necessary to accept a re-delivery of the Paver to you by Murray, and that you IMMEDIATELY REFUND TO MURRAY ALL FUNDS PAID TO YOU BY MURRAY, AS WELL AS PROVIDING COMPENSATION TO MURRAY FOR ALL DAMAGES AND LOSSES SUFFERED BY MURRAY TO DATE ATTRIBUTABLE TO AND REASONABLY FLOWING FROM THE FAILURE OF THE PAVER TO OPERATE PROPERLY, AND AS A DIRECT RESULT OF THE BREACH BY YOU OF THE SALES CONTRACT BETWEEN MURRAY AND YOUR ORGANIZATION.

Very truly yours,


Peter F. Davis


Copies:
Andrew A. Andre, Vice-President/Branch Manager
Ingersoll-Rand Equipment & Services Company
300 Turnpike Road
Southborough, Mass. 01772

Mr. Arnold G. Johnson, Jr., President
Murray Paving & Reclamation, Inc.
PO Box 329
Framingham, Mass. 01702

IRCO CONFIDENTIAL 0023



**Ingersoll-Rand** | 200 Chestnut Ridge Road
Woodcliff Lake, NJ 07677-8738

July 11, 2003

Peter F. Davis, Esq.
50 Congress Street, Suite 630
Boston, MA 02109

**Re: Murray Paving & Reclamation, Inc.**

Dear Mr. Davis:

Your June 25, 2003 letter to Messrs. Henkel and Schlesinger has been referred to me. I handle litigation for Ingersoll-Rand Company, indirect parent of Blaw-Knox Construction Equipment Corporation.

I am currently reviewing this matter, and I will be in touch once my review is completed. To expedite my investigation, please describe to me in writing the specific problems your client is currently experiencing with the paver in question.

Very truly yours,

John D. Soriano
Assistant General Counsel
Litigation

JDS:cs

cc: Jim Plasynski, Esq.
    Mr. Andrew Andre

M:\JOINTLAW\Word\jds\murray paving.doc

IRCO CONFIDENTIAL 002.

# PETER F. DAVIS
### ATTORNEY AND COUNSELLOR-AT-LAW
50 CONGRESS STREET, SUITE 630
BOSTON, MASSACHUSETTS 02109

July 17, 2003

John D. Soriano, Esquire
Assistant General Counsel
Ingersoll-Rand
200 Chestnut Ridge Road
Woodcliff Lake, NJ  07677-8738

TELEPHONE: (617) 227-1344
FACSIMILE: (617) 227-3674
FACSIMILE: (617) 723-2844
EMAIL: PFD@DAVISESQ.NET

Re:    Murray Paving & Reclamation, Inc.
         Sales Order No.  641-21990

**RECEIVED**

JUL 2 1 2003

**JOHN D. SORIANO**

Dear Mr. Soriano:

Thank you for your letter of July 11, 2003, replying to my earlier letter to Messrs. Henkel and Schlesinger.  I would be pleased to discuss the matter to you following your review.

In the meantime, in response to your inquiry, the following is at least a partial listing of the problems encountered by Murray Paving, relative to the paver. It is my understanding that these problems have previously been brought to the attention of Ingersoll-Rand personnel.  (This listing is not necessarily in chronological order, and may well be incomplete.)

1. Hopper doors would not raise.  A hydraulic cylinder had to be replaced.  When the doors still would not raise, I-R personnel increased the hydraulic pressure from a factory recommended setting to a substantially higher setting (1800 lbs to 3000 lbs.)

2. There was a hydraulic leak at the manifold, due to a loose connection, causing oil to be blown out all over a project, with ensuing environmental damage.

3. Factory welding on the exterior doors was sub-standard and incomplete, causing/permitting mix to enter the unwelded area,  which separated the steel and caused a mark in the mat.

4. Exterior doors would not close properly, due to alignment problem.

5. Screed would not lower, caused by a wiring problem.  A wiring harness was not long enough, causing stretching, which resulted in broken wire, which led to a short-circuit in the system.

6. Auger exterior stop broke off, due to broken bolts.

IRCO CONFIDENTIAL 002

7.  Screw handles would not operate properly;  two hands were needed to turn handles, rather than the handling turning easily with a single hand.

8.  Arm rest on seat fell off.

9.  Shim dropped out of screed.

10.  Screed would not lower on multiple occasions.

It is my understanding that notwithstanding virtually continuous efforts by I-R personnel, paver would not operate without breakdowns, and downtime on the paver was essentially equal to operating time! Paver operation was and is so undependable that Murray Paving has not been willing - let alone able - to use the paver, and the quarter-million dollar expenditure for a virtually worthless machine has been a disaster for Murray Paving, keeping in mind that paving operations require continuous and reliable use of the machine.

Under these circumstances, Murray Paving has determined that its only recourse is to declare I-R and Blaw-Knox to be in breach of the purchase contract,  to demand rescission and termination of the contract, to demand a full refund of the purchase price, and to insist on compensation for all damages flowing from the breach.

Very truly yours,

Peter F. Davis

Copy:  Mr. Arnold G. Johnson, Jr., President

IRCO CONFIDENTIAL 0026

# PETER F. DAVIS
### ATTORNEY AND COUNSELLOR-AT-LAW
### 50 CONGRESS STREET, SUITE 630
### BOSTON, MASSACHUSETTS 02109

August 6, 2003

John D. Soriano, Esquire
Assistant General Counsel
Ingersoll-Rand
200 Chestnut Ridge Road
Woodcliff Lake, NJ 07677-8738

TELEPHONE: (617) 227-1344
FACSIMILE: (617) 227-3674
FACSIMILE: (617) 723-2844
EMAIL: PFD@DAVISESQ.NET

Re:    Murray Paving & Reclamation, Inc.
        Sales Order No. 641-21990

RECEIVED

AUG 1 1 2003

JOHN D. SORIANO

Dear Mr. Soriano:

You wrote to me on July 11, 2003, requesting details, as a follow-up to my demand letter of June 25, 2003.

I replied by letter dated July 17, 2003.

I have not heard from you since that time regarding my client's claim.

To make sure that we have explored all aspects of this unfortunate episode prior to litigation, may I hear from you relative to the position of Ingersoll-Rand and Blaw-Knox.

Very truly yours,

Peter F. Davis

Copy:  Mr. Arnold G. Johnson, Jr., President

IRCO CONFIDENTIAL 00



**Ingersoll-Rand** | 200 Chestnut Ridge Road
Woodcliff Lake, NJ 07677-8738

September 5, 2003

Peter F. Davis, Esq.
50 Congress Street, Suite 630
Boston, MA 02109

**Re: Murray Paving & Reclamation, Inc.**

Dear Mr. Davis:

I have your August 6 letter, which I received while out on vacation.

I understand the paver in question was recently in for warranty service. I have requested details as to that service. Once I receive those details, I will be in touch with our position.

Very truly yours,

John D. Soriano
Assistant General Counsel
Litigation

JDS:cs

cc: Mr. Andrew Andre

M:\JOINTLAW\Word\jds\murray paving2.doc

IRCO CONFIDENTIAL 00

# PETER F. DAVIS
### ATTORNEY AND COUNSELLOR-AT-LAW
50 CONGRESS STREET, SUITE 630
BOSTON, MASSACHUSETTS 02109

September 30, 2003

TELEPHONE: (617) 227-1344
FACSIMILE: (617) 227-3674
FACSIMILE: (617) 723-2844
EMAIL: PFD@DAVISESQ.NET

John D. Soriano, Esquire
Assistant General Counsel
Ingersoll-Rand
200 Chestnut Ridge Road
Woodcliff Lake, NJ 07677-8738

**RECEIVED**

OCT 0 3 2003

**JOHN D. SORIANO**

Re:    Murray Paving & Reclamation, Inc.
       Sales Order No. 641-21990

Dear Mr. Soriano:

Your most recent letter to me, dated September 5, 2003, which was in response to my August 6, 2003, letter, promised a further response, when you had received some details, presumably from the Southborough facility.

I have not heard from you, notwithstanding your statements, and now Murray has again been subjected to leaking of hydraulic fluid from the track tension cylinder.

We have exchanged far too much correspondence, with reference to the above matter.

Please be advised that Murray's patience has been exhausted, and my instructions are to write this letter - a final letter - and then commence litigation, unless a realistic response is received immediately.

Very truly yours,

Peter F. Davis

Copy:  Mr. Arnold G. Johnson, Jr., President

IRCO CONFIDENTIAL 0(



**Ingersoll-Rand**

Ingersoll-Rand | 200 Chestnut Ridge Road
Woodcliff Lake, NJ 07677-8738

October 3, 2003

Peter F. Davis, Esq.
~~50 Congress Street, Suite 630~~
Boston, MA 02109

Re: **Murray Paving & Reclamation, Inc.**

Dear Mr. Davis:

As indicated in my September 5 letter to you, I have obtained the documents related to the warranty service performed on your client's paver.

My review of these documents indicates that the problems with the paver have been resolved by the warranty service. In light of this fact, and in accordance with sections 8 and 9 of the Terms and Conditions governing this contract, IR believes it has fulfilled its obligations to your client.

Please let me know if you have any comments or questions.

Very truly yours,

John D. Soriano
Assistant General Counsel
Litigation

JDS:cs

cc: Mr. Andrew Andre

M:\JOINTLAW\Word\jds\murray paving3.doc

IRCO CONFIDENTIAL 00.

# PETER F. DAVIS
### ATTORNEY AND COUNSELLOR-AT-LAW
50 CONGRESS STREET, SUITE 630
BOSTON, MASSACHUSETTS 02109

TELEPHONE: (617) 227-1344
FACSIMILE: (617) 227-3674
FACSIMILE: (617) 723-2844
EMAIL: PFD@DAVISESQ.NET

October 10, 2003

Ingersoll-Rand Equipment & Services Company
300 Turnpike Road, Route 9
Southborough, Mass. 01772

and

Ingersoll-Rand Company
200 Chestnut Ridge Road
Woodcliff, NJ 07675

Re:    Mass. Gen. Laws, Ch. 93A Demand Letter
Murray Paving & Reclamation, Inc.
Sales Order No. 641-21990

Gentlemen:

Please be advised that I represent Murray Paving & Reclamation, Inc. ("Murray"), to whom your organization sold a new Blaw-Knox 2003 Model PF-4410 Paver ("the Paver"), as set forth in the above referenced order.

I have had substantial correspondence with you and your attorney regarding "the Paver". The most recent response, by your attorney, was to deny any relief to Murray, on the ground that sufficient warranty repairs had been made.

Please be advised that your ultimate response is unsatisfactory, and is, in my opinion, an actionable violation of Mass. Gen. Laws, ch. 93A.

Accordingly, DEMAND is hereby made upon you for the return to Murray of the full purchase price, as well as compensation to Murray for all losses suffered to date by Murray, in connection with this transaction. The purchase price was $236,775.00 plus the delivery to you of a machine having a value of at least $12,000.00. Murray's out-of-pocket costs and the value of lost working time directly attributable to the failure of the paver to perform total approximately $100,000.00. Murray has suffered additional losses directly attributable to the unsatisfactory performance and condition of the paver.

IRCO CONFIDENTIAL 0031

Mass. Gen. Laws, Ch. 93A specifically protects someone situated as is Murray from conduct such as has been displayed by your organization, and requires you, in the event Notice and Demand are made upon you, to make a good faith response and offer of settlement within 30 days of such Notice and Demand.

Very truly yours,

Peter F. Davis

Copy - John D. Soriano, Esquire

CERTIFIED MAIL
RETURN RECEIPT REQUESTED
To both addressees

IRCO CONFIDENTIAL 0032

F. DAVIS

UNSELLOR-AT-LAW

REET, SUITE 630

HUSETTS 02109

TELEPHONE: (617) 227-1344
FACSIMILE: (617) 227-3674
FACSIMILE: (617) 723-2844
EMAIL: PFD@DAVISESQ.NET

r 10, 2003

my

and Letter
Inc.

y Paving & Reclamation, Inc. ("Murray"),
ox 2003 Model PF-4410 Paver ("the
r.

th you and your attorney regarding "the
ney, was to deny any relief to Murray, on
en made.

nse is unsatisfactory, and is, in my
ws, ch. 93A.

pon you for the return to Murray of the
rray for all losses suffered to date by
urchase price was $236,775.00 plus the
east $12,000.00. Murray's out-of-
ectly attributable to the failure of the
Murray has suffered additional losses
ace and condition of the paver.

---

U.S. POSTAGE
PAID
BOSTON, MA
02109
OCT 10 03
AMOUNT
$4.05
00067122-06

01772

9264

Peter F. Davis
Attorney-At-Law
50 Congress Street, Suite 630
Boston, MA 02109-4018

CERTIFIED MAIL

7001 0320 0003 3467 7007

Ingersoll-Rand Equipment & Services
Company
300 Turnpike Road, Route 9
Southborough, Mass. 01772

NAME
1st Notice
2nd Notice
Return

01772+1733

IRCO CONFIDENTIAL 003



**Ingersoll-Rand** | 200 Chestnut Ridge Road
| Woodcliff Lake, NJ 07677-8738

October 21, 2003


Peter F. Davis, Esq.
50 Congress Street, Suite 630
Boston, MA 02109

**Re: Murray Paving & Reclamation, Inc.**

Dear Mr. Davis:

Ingersoll-Rand Company ("IR") is in receipt of your October 10, 2003 letter.

At the outset, please note that your October 10 letter fails to meet the requirements of a "written demand for relief" pursuant to Section 9(3) of Mass. Gen Laws, ch. 93A as it does not "reasonably describe [] the unfair or deceptive act or practice relied upon."

In any event, as already set forth in my October 3 letter to you, we consider your client's claim to be meritless. IR has honored, and will continue to honor, its warranty obligations. Indeed, IR has gone above and beyond these obligations by offering to rebuild a unit for your client, which your client has rejected.

Furthermore, as noted in my October 3 letter, Section 9 of the governing contract unambiguously limits the amount and categories of damages for which IR is liable. For example, Section 9 limits IR's liability to the purchase price and expressly excludes liability for any consequential, incidental, indirect, special or punitive damages. I urge you review these contractual provisions, as IR will consider any claim which asserts such damages to be frivolous.

However, IR would like to maintain a good relationship with your client, and rest assured that IR will continue to honor its warranty obligations.

Very truly yours,

John D. Soriano
Assistant General Counsel
Litigation

JDS:cs

cc: Mr. Andrew Andre
    Jim Chamberlain, Esq.

IRCO CONFIDENTIAL 003